**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

RONNY DERRICK and ANGIE
DERRICK, a married couple,

      Plaintiffs,

v.                                    No. CIV 17-1245 RB/SMV

STANDARD NUTRITION COMPANY, a
Nebraska Corporation, dba A-C Nutrition, LP,
a Texas limited partnership; JOHN DOES 1–5;
and XYZ Corporate or Business Entities 1–5,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Ronny and Angie Derrick (Plaintiffs), owners of a horse breeding program, bring suit against Standard Nutrition Company (Defendant), a manufacturer of animal feed. Plaintiffs contend that Defendant manufactured and sold them feed contaminated with a substance that caused injury and death to many of their horses. Both Plaintiffs and Defendant have moved for summary judgment on a variety of claims. (*See* Docs. 58; 73.) Defendant has also moved to exclude the testimony of Dr. Ronald Box. (Doc. 106.) Jurisdiction arises under 28 U.S.C. § 1332. Having considered the submissions of counsel and relevant law, the Court will **GRANT IN PART** Defendant's motion for summary judgment (Doc. 58), **DENY** Plaintiffs' motion for partial summary judgment (Doc. 73), and **GRANT IN PART** Defendant's motion to exclude (Doc. 106).

## I.    Plaintiffs may only utilize Dr. Box as a fact witness.

Before laying out the relevant factual background, the Court must discuss Defendant's motion to exclude Plaintiffs' witness, Dr. Ronald Box, D.V.M. (*See* Doc. 106.) As will be discussed in more detail in the next section, Dr. Box visited Plaintiffs' ranch after they discovered that two of their horses had died in December 2016. Dr. Box took samples from the deceased

horses and from the horses' feed. Dr. Box sent those samples to a lab for testing. He later offered his opinion on the cause of the horses' death.

Plaintiffs contend that "Dr. Box was timely disclosed as an expert"[1] (*see* Doc. 83 at 2 n.1) and attempt to rely on Dr. Box's statements to create a genuine dispute of fact regarding causation (*see*, *e.g.*, Doc. 100 at 7). However, as United States Magistrate Judge Stephan Vidmar previously ruled, Plaintiffs failed to properly disclose Dr. Box (or any expert) under Federal Rule of Civil Procedure 26(a)(2)(D) by August 29, 2018—the scheduling deadline set by the Court. (*See* Doc. 66 at 3.) In fact, on October 19, 2018, during oral argument on a belated motion to extend that deadline, "Plaintiffs' counsel advised the Court that, not only was he unprepared to identify *any* experts on liability and causation, but . . . he was unsure whether he *ever* would have any such experts." (*Id.* at 4 (emphasis added).) Despite their assertions to the contrary, it is clear to the Court that Plaintiffs failed to comply with the relevant rules regarding the disclosure of experts.

Consequently, Plaintiffs may not call Dr. Box as an *expert* witness, but they may call him as a *lay* witness. When a witness or a treating physician—or in this case, a veterinarian—is not disclosed as an expert under Rule 26(a)(2), the witness can "still testify as a fact witness, but cannot testify as an expert." *Peshlakai v. Ruiz*, No. CIV 13-0752 JB/ACT, 2013 WL 6503629, at *13 (D.N.M. Dec. 7, 2013) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) (brackets omitted)). Because the parties had not specifically briefed the issue of what

---

[1] To the extent Plaintiffs argue that Dr. Box's letter qualifies as an "expert report" under Federal Rule of Civil Procedure 26(a)(2)(B), the Court finds that the letter did not contain the elements required under that rule. (*See* Docs. 83 at 2 n.1; 101-2.) *See also Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 656 (10th Cir. 2018) ("Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires disclosure of an expert's report, which 'must contain . . . a complete statement of all opinions the witness will express and the basis and reasons for them.'" These "expert reports . . . are intended not only to identify the expert witness, but also to set forth the substance of the direct examination . . . [and are] necessary to allow the opposing party a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.") (quotation marks and citations omitted)).

portions of Dr. Box's testimony may be admitted as lay witness testimony, the Court ordered expedited briefing. (*See* Doc. 105.)

Unsurprisingly, Defendant argues that all of Dr. Box's testimony should be excluded, while Plaintiffs argue that all of Dr. Box's testimony should be admitted. (Docs. 106; 110.) In its reply brief, Defendant also raises the issue of whether Dr. Box actually "treated" the horses at issue. (Doc. 111 at 4.) The Court declines to address this argument, as it was not raised in Defendant's motion. *See Eichenberg v. Astrue*, No. 12-cv-00795 MV/CG, 2013 WL 12329766, at *6 (D.N.M. July 19, 2013) (noting that "[i]t is clearly settled that a party cannot raise new issues in a reply brief") (citations omitted). While Plaintiffs disregard the Court's instructions to "*explicitly identify the portions of Dr. Box's testimony that should come in as a treating veterinarian/lay witness*" (Doc. 109 at 1), they do mention three distinct areas of Dr. Box's testimony they believe should be admitted: (1) his involvement on the day he examined Plaintiffs' horses; (2) facts about monensin; (3) his diagnosis of monensin poisoning. (*See* Doc. 110.)

<u>The Court will admit testimony regarding Dr. Box's observations and actions on the day he examined the horses.</u>

After Plaintiffs discovered the first two dead horses in December 2016, they called Dr. Box, who came to their ranch the same day. (*Id.* at 2–3.) Dr. Box "was familiar with the region" and made "personal observations . . . to rule out such alternatives as rattlesnake bites and toxins that grow locally, such as Rayless Goldenrod." (*Id.* at 3.) Dr. Box took tissue samples from the dead horses and feed samples from the feed bin. (*See id.*) The Court agrees that it is appropriate to admit Dr. Box's observations of the environment and the animals on the day he visited Plaintiffs' ranch in 2016,[2] as well as his testimony that he took samples from the animals and the feed. *See*

---

[2] Plaintiffs vaguely allude to a second set of tissue samples Dr. Box took in 2019 that yielded additional lab results. (Docs. 107 at 3; 110 at 4.) Plaintiffs have not submitted this evidence to the Court. Thus, the Court will not consider any newly-submitted "evidence" in this Opinion.

*Peshlakai*, 2013 WL 6503629, at *17 (discussing *Witherspoon v. Navajo Ref. Co.*, L.P., CIV 03–1160 BB/LAM, 2005 WL 5988650, at *2 (D.N.M. June 28, 2005), where the court concluded "that physician who treated the plaintiffs in a toxic tort case, not disclosed under rule 26(a)(2), could testify only to 'observations and treatment developed while actually treating Plaintiffs'").

Dr. Box may not testify about monensin.

Plaintiffs next argue that "facts about monensin are not 'specialized knowledge.'" (Doc. 110 at 5 (italics and capitalization omitted).) Plaintiffs generally discuss the results of the lab report analyzing Dr. Box's feed and tissue samples, and the fact that Defendant places warning labels on certain types of feed that contain monensin. (*Id.* at 5–6.) Plaintiffs conclude that it is common knowledge that horses should not ingest monensin, as "[i]t was known to Defendant[] and to every feed customer in the United States who ever purchased feed medicated with monensin and who glanced at the" warning label. (*Id.* at 6–7.) Plaintiffs' argument is without merit.

Again, "[u]nder Tenth Circuit law, treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient." *Witherspoon*, 2005 WL 5988650, at *1 (citing *Davoll v. Webb*, 194 F.3d 1116, 1138–39 (10th Cir. 1999)) (subsequent citations omitted). "This means that Dr. [Box] may testify about [his] observations" from the day he actually saw the horses, but he "may not provide testimony beyond what [he] perceived or did." *See id.* at *2. In other words, Dr. Box may not testify about monensin—what it is, its effect on horses, whether feed for horses may contain monensin, et cetera. If he testifies at trial, Dr. Box may, without objection, read the results of the lab reports Plaintiffs received as a result of the samples he took in December 2016. Beyond reading those results, Dr. Box may not testify further about monensin or speculate about the meaning of the lab results.

<u>Dr. Box may not offer an opinion on causation/diagnosis.</u>

Plaintiffs contend that "the only part of Dr. Box's anticipated testimony that may *appear* to be an opinion of his based on the 'specialized knowledge' of a veterinary expert would be his opinion that it was Defendant['s] monensin that killed and damaged the horses. But that is *not* specialized expert knowledge." (Doc. 110 at 5.) Plaintiffs cite no authority for this proposition, and the Court firmly rejects it.

> A witness not properly identified as an expert pursuant to rule 26 may . . . testify as a lay witness to opinions which are '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'

*Peshlakai*, 2013 WL 6503629, at *15 (quoting Fed. R. Evid. 701). Dr. Box may not, therefore, "testify to any opinions regarding causation under rule 701, because opinions regarding causation of a medical condition require 'knowledge derived from previous professional experience[, which] falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Id.* at *17 (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011) (internal quotations omitted) (alteration in original)).

Plaintiffs acknowledge that "[a] treating physician's opinions regarding diagnosis of a medical condition are almost always expert testimony, because diagnosis requires judgment based on scientific, technical, or specialized knowledge in almost every case.'" (Doc. 110 at 11 (quoting *Peshlakai*, 2013 WL 6503629, at *17 (quoting *James River*, 658 F.3d at 1214 (emphasis omitted)))).) They urge the Court to recognize that "[t]here are cases, however, where a diagnosis may be lay testimony, because it is within the province of the common person." (*Id.* (quoting *Peshlakai*, 2013 WL 6503629, at *17 (citation omitted)).) As explained later in this Opinion, the Court does not agree that a diagnosis of monensin poisoning "is within the province of the common

person." *See Peshlakai*, 2013 WL 6503629, at *17 (citation omitted). Consequently, Dr. Box may not offer an opinion on causation or diagnosis. If this case proceeds to trial, this ruling will stand.

## II.    Factual Background[3]

Plaintiffs breed and raise horses. (*See* Doc. 1-1 (Compl.) ¶¶ 1, 4.) Plaintiffs keep their horses, as well as some cattle, on their ranch in Eddy County, New Mexico. (*See id.* ¶ 6; Docs. 58-A at 2; 58-B at 3; 58-D at 171:18–22.) Defendant manufactures, sells, and distributes animal feed. (*See* Compl. ¶¶ 1, 9.) Mr. Derrick worked with Defendant's employee, Mr. Kevin Floyd, to design a custom feed for Plaintiffs' ranch, but the parties dispute whether the feed was specifically designed for horses or cows. (*See* Docs. 58-C at 2 ("Defendant[] knew [the feed] was primarily for [Plaintiffs'] equine stock."); 58-D at 203:5–7 ("When [Mr. Derrick] designed that feed with . . . [Mr.] Floyd, it was designed for horses. [He] told him it was for horses."); 102-D at 32:7–16 (Mr. Floyd testified that "[w]e were discussing cattle feed, strictly for the cattle when we did the formulation, and what he was feeding was for cattle").) They named the formula Derrick Super Breeder Lightning 18-6 ("Derrick Super Breeder"). (*See* Doc. 102-F (Derrick Super Breeder feed label).) Plaintiffs fed Derrick Super Breeder to their horses and their cattle. (*See*, *e.g.*, Doc. 58-A at 2 ("every time [Mr. Derrick] called" to order Derrick Super Breeder, "he reminded Defendant['s] personnel that the feed was for horses and cattle").)

The Feeding Directions on the Derrick Super Breeder label state: "Feed to beef cattle at a rate of 2 to 4 lbs per head per day. . . . Contact your AC Nutrition representative for feeding and

---

[3] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to the party opposing summary judgment. Fed. R. Civ. P. 56; *see also Simon v. Taylor*, 252 F. Supp. 3d 1196, 1229 (D.N.M. 2017) ("[t]he court handles cross-motions as if they were two distinct, independent motions . . . [and] in evaluating each motion, the court must consider the facts and inferences in the light most favorable to the non-moving party") (quotation omitted). The Court recites only that portion of the factual and procedural history relevant to these motions.

management recommendations specific to your operation." (Doc. 102-F.) The label specifies that the feed is "[f]or beef cattle on range pasture." (*Id.*) The Guaranteed Analysis lists percentages of crude protein, crude fat, crude fiber, as well as a variety of vitamins and minerals (i.e., calcium, phosphorus, salt, magnesium, etc.). (*See id.*) The label also includes an ingredients list and two "caution" warnings: (1) "This product contains added copper. Do Not Use in feeds for Sheep"; and (2) "Follow Label Directions. The addition of higher levels of selenium to feeds containing this product is not permitted." (*See id.*)

Plaintiffs purchased four loads of Derrick Super Breeder from Defendant. (*See* Doc. 58-A at 2.) Mr. Derrick always called to order the feed. (*See id.* (Mr. Derrick "remember[s] that each phone call was from him"); Doc. 58-B at 3 (stating that Mr. Derrick "communicated with [Defendant]").) The fourth order of 24,000 pounds of Derrick Super Breeder, which Defendant delivered to Plaintiffs' ranch on December 6, 2016, is at issue in this lawsuit. (*See* Doc. 73-2.) Mr. George Madrazo, Defendant's Operations Manager and Federal Rule of Civil Procedure 30(b)(6) designee, acknowledged that approximately 3,500 pounds of a different feed was inadvertently added to Plaintiffs' order.[4] (*See* Docs. 80 at 1; 73-8 at 4:11–13, 25:2–16 ("Q. Where did the 3,506 pounds come from? A. From the product that was stuck in the west bin.").) Mr. Kevin Floyd,

---

[4] Defendant disputes whether and how much foreign material was put into Plaintiffs' feed. (*See* Doc. 81 at 5.) Defendant asserts that Mr. Madrazo "was not present when the subject feed was manufactured" and so cannot "testify as to the exact circumstances of the production . . . ." (*Id.*) As Plaintiffs point out, however, Defendant named Mr. Madrazo as its Rule 30(b)(6) designee. (*See* Doc. 80.) "To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf." *Ameri v. GEICO Gen. Ins. Co.*, No. CIV 14-0966 JB/SCY, 2015 WL 4461212, at *13 (D.N.M. July 13, 2015) (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999)) (internal and subsequent citations omitted). Defendant has not objected that Mr. Madrazo was asked to testify about a subject that was not included in the Rule 30(b)(6) notice. (*See* Doc. 81.) Thus, the Court finds that Defendant has failed to create a genuine dispute of fact and accepts, for purposes of this Opinion, that foreign material was inadvertently placed in Plaintiffs' feed order at some point in the manufacturing process. The Court finds that the amount of foreign material is immaterial to its decision and makes no ruling on the amount of foreign material added.

Defendant's Co-Operations Manager, "was aware that [Plaintiffs' order] was overweight[,]" but he did not inform Mr. Derrick of the difference." (*See* Doc. 102-4 at 80:3–82:2.)

Approximately three to four days after the December 2016 feed delivery, Mr. Derrick went out in the morning to feed the horses and cattle. (Doc. 58-D at 153:15–19.) Near where the horses feed, Mr. Derrick found two of his horses dead. (*Id.* at 162:23–163:8.) He walked around the two horses to see if there were signs of injury, but "they just looked like they" had "take[n] a nap." (*Id.* at 164:2–6.) He located several other horses and noticed that they looked "lethargic" and "sick." (*Id.* at 164:18–23.) The horses were moving "at a slow walk[,]" they were "sweating all over [despite it being a cold day], carried their heads real low, [and] wouldn't . . . get out of a walk." (*Id.* at 163:19–21, 164:21–23.) Mr. Derrick immediately called veterinarian Dr. Ronald Box. (*Id.* at 164:23–25.)

Dr. Box came to the ranch and looked at the horses and their environment. (*See id.* at 169:1–5; Doc. 101-3 at 33:25–34:8.) He took a feed sample from Plaintiffs' overhead feed bin and sent it to the Texas A&M Veterinary Medical Diagnostic Laboratory (TVMDL) for testing. (*See* Docs. 58-D at 169:15–170:10; 101-3 at 35:3–7.) The samples showed that at least part of the feed contained 1.2 parts per million (ppm) of monensin, or 1.2 mg/kg of feed material.[5] (*See* Doc. 58-E; *see also* Doc. 101-4 at 38:5–39:5 (Dr. Hall's testimony that some of the feed tested was negative for monensin, and one sample was positive).) Monensin (also referred to by its brand name, Rumensin) is a type of antibiotic sometimes added to cattle feed. (*See* Doc. 58-E.) *See also* Daniel Lowicki & Adam Huczynski, *Structure & Antimicrobial Properties of Monensin A & Its Derivatives: Summary of Achievements*, Biomed Research Int'l (Feb. 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3586448/; *Rumensin (Monensin Feedyard and*

---

[5] It is possible for "hot spots" to develop in feed, which are areas "that may have a higher concentration of [a substance] than other areas of the feed" contain. (*See* Doc. 101-4A at 109:20–110:2.)

*Pasture)*, https://www.elanco.us/products-services/beef/rumensin. "The lethal oral dose for monensin in horses is 2 to 3 mg/kg body weight." (*See* Doc. 58-E.) The veterinary toxicologist who signed the TVMDL lab report stated that "[a]t a concentration of 1.2 mg/kg in the feed, a 1000 lb horse (454 kg) would have to consume more than its body weight in feed to get a lethal dose of monensin." (*See id.*) Defendant's expert, Dr. O. Hall, D.V.M., Ph.D., opined that the dose of monensin Plaintiffs' "horses would have received, even if [their] total diet contained 1.2 ppm monensin[,] . . . is way too low to cause any adverse effect in horses, as indicated [by his opinion and] by the TVMDL diagnostic report."[6] (Doc. 58-F at 6; *see also* Doc. 58-E.)

Dr. Box examined the two dead horses and saw nothing consistent with an external injury. (Doc. 101-3 at 34:9–12.) Dr. Box also took tissue and stomach contents samples from the two dead horses. (*See* Docs. 58-F at 3; 73-5 at 2.) The tissue samples had broken down too far to yield conclusive results. (*See* Docs. 58-F at 6 ("The only two horses necropsied[7] were too autolytic for tissue evaluation."); 73-5 at 2 (Dr. Box noted that he "sent in heart [and] liver from both horses – They were unable to do histopath because of the severe autolysis.").) The stomach contents sample did not indicate the presence of monensin. (*See* Doc. 58-F at 3.) He also noticed that the surviving horses "didn't look perfectly right. They looked a little sluggish, their heads were down, but they weren't dying." (Doc. 101-3 at 65:7–9.)

Dr. Box did not take any samples from the horses that were still alive and showing signs

---

[6] Plaintiffs dispute this fact and refer to pages 92–94 and 118 of Dr. Hall's deposition to support the contention that "it does not take much more monensin to injure or kill a horse than an amount that may not do any detectable harm." (*See* Doc. 100 at 4 (citing Doc. 101-4 at 92:16–94:15, 119:7–120:9; 118:8–13).) Plaintiffs did not, however, include those pages in their exhibit (*see* Docs. 101-4; 101-4A), and the Court cannot find the pages in the remaining exhibits. Thus, Plaintiffs fail to create a genuine dispute of fact regarding Dr. Hall's opinion that the amount of monensin detected in the sample was below the minimum level of monensin that could harm a horse.

[7] A necropsy is "an autopsy performed on an animal." Necropsy, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/necropsy.

of lethargy and illness. (*See* Doc. 58-D at 169:1–7.) Mr. Derrick spoke to several other veterinarians after the first two horses died, including the state veterinarian, Dr. Orton. (*Id.* at 181:16–17.) Dr. Orton advised Mr. Derrick to bring some of the affected horses in to "let him listen to their heart and . . . he could probably tell which ones were . . . affected . . . ." (*Id.* at 182:9–13.) Plaintiffs could then obtain ultrasounds on any or all of the affected horses. (*Id.* at 182:12–15.) For a variety of reasons, including distance, cost, and potential harm to young, unbroken horses, Plaintiffs have not taken their horses to Dr. Orton, nor have they obtained ultrasounds or other testing on any of their living horses. (*See id.* at 179:6–181:9, 182:14–184:21.) An additional four more horses have died since December 2016 (*see id.* at 180:6–18), but Plaintiffs have not submitted any further test results from the deceased horses.

## III. Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue for trial."
*Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted). The party
opposing a motion for summary judgment "must set forth specific facts showing that there is a
genuine issue for trial as to those dispositive matters for which it carries the burden of proof."
*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990)
(citing *Celotex*, 477 U.S. at 324).

## IV.    Analysis

Plaintiffs bring myriad  claims against Defendant. In Count I, entitled Products Liability,
Plaintiffs mention absolute liability, strict liability, negligence, negligence per se, breach of
contract, breach of warranties, negligent infliction of emotional distress (NIED), and outrage. (*See*
Compl. ¶¶ 24–36.) Plaintiffs also bring claims for cruelty to animals (Count II); unfair, deceptive,
and unconscionable trade practices under New Mexico's Unfair Practices Act (UPA) (Count III);
fraud and misrepresentation (Count IV); vicarious liability (Count V); and negligent hiring,
management, and supervision (Count VI). (*See id.* ¶¶ 37–50.)

While acknowledging that there is a dispute of fact regarding causation (*see* Doc. 83 at 1),
Plaintiffs move for partial summary judgment on their claims for fraud and misrepresentation;
unfair, deceptive, and unconscionable trade practices; strict products liability; negligence and
negligence per se; and breach of contract and implied warranties. (*See* Doc. 73.) Defendant moves
for summary judgment on the claims for negligence; strict products liability; cruelty to animals;
NIED; and breach of contract as to Ms. Derrick. (*See* Doc. 58.) Defendant also contends that
Plaintiffs' discovery missteps warrant dismissal of all of their claims. (*See id.* at 13–16.)

### A.    Negligence

To succeed on a negligence claim, Plaintiffs must prove that Defendant owes them a duty,

"[D]efendant breached that duty, and . . . the breach caused the injuries to [P]laintiff[s]." *Fernandez v. Ford Motor Co.*, 879 P.2d 101, 109 (N.M. Ct. App. 1994) (citing *Lopez v. Maez*, 651 P.2d 1269, 1274 (N.M. 1982); *Calkins v. Cox Estates*, 792 P.2d 36, 39 (N.M. 1990)). At issue here is the element of causation. Plaintiffs contend that monensin present in Defendant's feed injured and killed several of their horses. (*See* Doc. 100 at 2 ("The deaths, damage and destruction are a direct result of the Defendant feed mill's wrongful inclusion of the drug monensin (brand name Rumensin) in feed it delivered to Plaintiffs in December 2016.").)

Defendant argues that Plaintiffs cannot establish causation, because the monensin level in the feed tested was lower than would be necessary to injure or kill a horse. (*See* Doc. 58 at 7–8 (citing Docs. 58-E; 58-F at 6).) When Dr. Box visited Plaintiffs' ranch in December 2016, he took samples of the horses' feed from the overhead feed bin and sent it to TVMDL for testing. (*See* Docs. 58-D at 169:15–170:10; 101-3 at 35:3–7.) The samples showed that at least part of the feed contained 1.2 parts per million (ppm) of monensin, or 1.2 mg/kg of feed material. (*See* Doc. 58-E; *see also* Doc. 101-4 at 38:5–39:5.) Defendant's expert, Dr. Hall, opined that the dose of monensin Plaintiffs' "horses would have received, even if [their] total diet contained 1.2 ppm monensin[,] . . . is way too low to cause any adverse effect in horses, as indicated [by his opinion and] by the TVMDL diagnostic report." (Doc. 58-F at 6; *see also* Doc. 58-E.) Plaintiffs have not presented any expert testimony to dispute this assertion.

Plaintiffs further theorize that there were "hot spots" in the feed, pockets of feed with more monensin than the amount that was present in the sample they had analyzed. (*See* Doc. 100 at 4–5.) Plaintiffs' evidence for this theory is shaky at best. Plaintiffs failed to secure an expert to testify about hot spots. Instead, they refer to testimony from Defendant's expert, Dr. Hall, who agreed that it is possible to have areas of feed with "a higher concentration of something than other areas

of feed." (Doc. 101-4A at 109:20–110:2.) And while Dr. Hall testified that the only way "to determine if there were areas of hot spots in the feed is if multiple samples were taken of the feed itself to look at variability across that sampling" (*id.* at 110:11–13), Plaintiffs have failed to provide any additional test results of the feed at issue. Instead, they will presumably ask the jury to infer that the feed *probably* contained hot spots of monensin.

Plaintiffs' more pressing problem arises from the fact that they have no expert testimony to support their theory that their horses were injured or died as a result of monensin poisoning. In December 2016, Dr. Box took tissue samples of the first two horses that died, but the tissue had broken down too much to yield conclusive results. (*See* Docs. 58-F at 6; 73-5 at 2.) The stomach contents sample did not indicate the presence of monensin. (*See* Doc. 58-E; *see also* Doc. 58-F at 3.) Plaintiffs argue that four other horses have died due to monensin exposure since December 2016, yet Plaintiffs have not submitted evidence of testing on any of these other horses. (*See* Doc. 58-D at 180:6.) Plaintiffs also argue that the remaining living horses also showed signs indicative of monensin exposure (*see*, *e.g.*, Doc. 100 at 8), yet they do not offer expert testimony to support this theory. Without expert testimony, Plaintiffs cannot withstand summary judgment.

"Like most other jurisdictions in the United States, New Mexico requires expert testimony to show causation in" cases involving medical negligence, professional malpractice, crashworthiness, negligent installation, and stray voltage claims "where [causation] cannot be determined by common knowledge that an average person ordinarily possesses." *Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1060–61 (D.N.M. 2016); *see also Nez v. United States*, No. 16-cv-0527-MV-KBM, 2019 WL 581476, at *16 (D.N.M. Feb. 13, 2019) ("In New Mexico, evidence establishing proximate cause in a medical negligence case must show proof to a 'reasonable degree of medical probability' that the negligence caused the injury.")

(quoting *Alberts v. Schultz*, 975 P.2d 1279, 1286 (N.M. 1999)) (subsequent citation omitted)). The general rule is that expert testimony is required "when the issue of causation is presented in a context which is not a matter of common knowledge." *Am. Mech. Sols.*, 184 F. Supp. 3d at 1061.

Plaintiffs urge the Court to find that a diagnosis of monensin poisoning is "within the province of a common person." (Doc. 110 at 11 (quoting *Peshlakai*, 2013 WL 6503629, at *17 (internal citations omitted)).) Plaintiffs cite to *United States v. Henderson*, 409 F.3d 1293, 1296, 1299–1300 (11th Cir. 2005), where a district court allowed a treating physician to testify that her patient had a fractured jaw after he was struck with an object. On appeal, the Eleventh Circuit applied the harmless error standard and found that it did "not harbor a grave doubt that the jury would have changed its verdict . . . had it not heard [the physician's] statement" and thus found "any error harmless." *Id.* at 1300. Here, Plaintiffs must prove that monensin exposure caused injuries and/or death to their horses. A diagnosis of monensin poisoning is certainly more complex than a diagnosis of a fracture after a blow to the jaw. Such medical knowledge is, as a matter of law, outside the realm of common experience. *See* Fed. R. Evid. 701. Because Plaintiffs have not secured expert testimony on causation, they cannot withstand Defendant's motion for summary judgment. The Court will dismiss Plaintiffs' claim for negligence.

### B.      Negligence Per Se

Plaintiffs must prove four elements to maintain a claim of negligence per se:

> 1) a statute that prescribes certain actions or that defines a standard of conduct; 2) a violation of the statute; 3) a statute that protects a class of persons, including the plaintiff; and 4) some harm or injury to the plaintiff that must generally be of the type the legislature, through the statute, sought to prevent.

*Heard v. Loughney*, No. CIV 16-487 JP/SCY, 2016 WL 10179246, at *3 (D.N.M. July 14, 2016) (citing *Archibeque v. Homrich*, 543 P.2d 820, 825 (N.M. 1975)). Here, Plaintiffs contend that Defendant violated the New Mexico Commercial Feed Act, N.M. Stat. Ann. §§ 76-19A-1–17, by

misbranding or adulterating the feed with monensin. (*See* Doc. 73 at 12–13.) Critically, Plaintiffs "still must prove causation in a negligence per se action." *Heard*, 2016 WL 10179246, at *3 (citing *Archibeque*, 543 P.2d at 825) ("Once negligence per se is found, the fact finders would still have to determine whether the negligence per se was the actual and proximate cause of the accident.") (internal citations omitted); *Fitzgerald v. Valdez*, 427 P.2d 655, 658 (N.M. 1967) ("The question of causation exists when the negligence is negligence per se.") (internal citations omitted)). As the Court found above, Plaintiffs will be unable to establish that their horses were injured and/or died due to monensin in Defendant's feed. Consequently, the Court will dismiss Plaintiffs' negligence per se claim.

### C.      Strict Products Liability

Plaintiffs bring a claim for strict products liability. (Compl. ¶ 26.) "Under the strict products liability theory, a supplier of products is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use." *Smith ex rel. Smith v. Bryco Arms*, 33 P.3d 638, 644 (N.M. Ct. App. 2001) (citing N.M. UJI 13-1406; *Fernandez*, 879 P.2d at 110). "The burden of proving the element of causation of the injury remains on the plaintiff even in a products liability action." *Huber v. Armstrong World Indus., Inc.*, 930 F. Supp. 1463, 1465 (D.N.M. 1996) (citing *Brooks v. Beech Aircraft Corp.*, 902 P.2d 54, 61 (N.M. 1995) ("in recognizing a new cause of action 'impos[ing] strict liability against manufacturers for injuries *caused by* defective product design'")). Again, Plaintiffs will be unable to establish causation. Consequently, the Court will grant Defendant's motion and dismiss Plaintiffs' claim for strict products liability.

### D.      Cruelty to Animals

Plaintiffs bring a claim for cruelty to animals pursuant to N.M. Stat. Ann. §§ 30-18-1(B)

and (E), both of which are offenses defined in New Mexico's criminal code. Plaintiffs do not, however, have a private right of action for a state criminal statute. *See Hamilton-Warwick v. Volkswagen Grp. of Am.*, No. CV 18-443 (PAM/SER), 2018 WL 3677927, at *2 (D. Minn. Aug. 2, 2018) (dismissing claim under N.M. Stat. Ann. § 30-18-1, as plaintiff did not have a private right of action under the criminal statute). Plaintiffs do not argue that the legislature intended to create a private right of action in this statute, and the Court declines to supply that argument for them. (*See* Doc. 100 at 17.) In fact, Plaintiffs fail to respond to Defendant's argument at all. (*See id.*) Consequently, the Court will grant Defendant's motion with respect to the claim for cruelty to animals.

### E. Negligent Infliction of Emotional Distress

Defendant advances a number of reasons to explain why Plaintiffs' claim for NIED fails. First, Defendant argues that the majority of states do not allow plaintiffs to "collect emotional distress damages for harm to an animal." (Doc. 58 at 8–9 (collecting cases).) While the Court has not found a New Mexico case directly on point, it finds guidance in relevant authority discussing the tort of NIED.

The New Mexico Supreme Court has stated that "NIED is an extremely narrow tort that compensates a bystander who has suffered severe emotional shock as a result of witnessing a sudden, traumatic event that causes serious injury or death *to a family member*." *Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 286, 293 (N.M. Ct. App.), *aff'd*, 176 P.3d 277 (N.M. 2008) (quoting *Fernandez v. Walgreen Hastings Co.*, 968 P.2d 774, 777 (N.M. 1998) (internal citations omitted)). In *Baldonado*, the New Mexico Court of Appeals "consider[ed] and reject[ed] [an] attempt to expand the scope of the tort of [NIED]." *Id.* at 288. There, the plaintiffs witnessed an explosion of a natural gas pipeline, which caused horrific injuries and deaths to twelve people. *Id.* at 289.

Plaintiffs were not, however, related to any of the twelve victims. *Id.* at 294. "NIED is considered 'a tort against the integrity of the family unit.'" *Id.* (quoting *Ramirez v. Armstrong*, 673 P.2d 822, 825 (N.M. 1983), *overruled on other grounds by Folz v. New Mexico*, 797 P.2d 246, 249 (N.M. 1990)). Because the *Baldonado* plaintiffs did not have "a close marital or family relationship with the third-person victim[,]" defendant was "not liable for severe emotional harm to foreseeable witnesses of the effects of [its] negligence on" the victims. *See id.* The Court of Appeals specifically held that "[a]ny relaxation of the strict requirements imposed upon plaintiffs asserting NIED claims must be accomplished by [the New Mexico] Supreme Court." *Id.*

The same applies here. Plaintiffs have not directed the Court to controlling authority that would allow for NIED damages where the victims were animals. Plaintiffs fail to substantively respond to this argument at all. (*See* Doc. 100 at 17 (noting that "the law in these areas appears to be in flux" and the claim is asserted in "a good faith effort to preserve the issues for appeal").) Moreover, Plaintiffs have failed to identify medical providers or provide medical records in response to Defendant's request for information relevant to this claim. (*See* Doc. 58 at 12 (citing (Docs. 58-B at 16, 25; 58-C at 18, 27).) As Plaintiffs have not attempted to support their claim with either legal authority or relevant medical evidence, the Court will grant summary judgment to Defendant for the claim of NIED.

### F.     Fraud and Misrepresentation

Plaintiffs contend that Defendant misrepresented the contents of its feed, and such misrepresentations were either negligent and/or fraudulent. (*See* Compl. ¶¶ 44–47.)

#### 1.     Fraud

To establish a claim for fraudulent misrepresentation under New Mexico law, Plaintiffs must show: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation

or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." *Skyline Potato Co. v. Tan-O-On Mktg., Inc.*, 879 F. Supp. 2d 1228, 1253–54 (D.N.M. 2012) (quoting *Cain v. Champion Window Co. of Albuquerque*, 164 P.3d 90, 97 (N.M. Ct. App. 2007) (internal quotation omitted)). Plaintiffs contend that the label on the Derrick Super Breeder feed constitutes a misrepresentation of fact, as it did not include all of the ingredients due to the foreign matter in the feed. (*See* Doc. 73 at 5–6; (citing Doc. 102-F (the label on the feed)); *see also* Doc. 73-8 at 4:11–13, 25:2–16.)

Defendant argues that "the guaranteed analysis on the label for the subject feed is a statement that the feed contains a minimum of what is stated on the label. It is *not* a guarantee that the feed contains nothing other than what is stated on the label." (Doc. 81 at 8.) And while Mr. Madrazo, Defendant's Rule 30(b)(6) designee, testified that the addition of the foreign material meant that Plaintiffs did not receive the feed they had ordered (*see* Doc. 73-8 at 103:2–14), his testimony does not solve the dispute over whether the "Guaranteed Analysis" represents a promise that the feed contains *only* the ingredients stated on the label. Neither party cites any relevant legal authority that would dictate a result on this subject. Thus, at the very least, this element presents an issue of fact that precludes summary judgment.[8] The Court will deny Plaintiffs' motion on the issue of fraud.

---

[8] Plaintiffs do not attempt to connect the facts or any legal authority to the remaining elements, and the Court declines to manufacture those arguments on Plaintiffs' behalf. The Court pauses to note that the manner in which Plaintiffs have presented their "arguments" both "for and against summary judgment have thwarted the [C]ourt's efforts at providing a meaningful opinion that could focus the issues at trial and . . . save the parties, and the Court, considerable time and expense." *See Tripoli Mgmt., LLC v. Waste Connections of Kan., Inc.*, No. 10-1062-SAC, 2011 WL 2897334, at *13 n.3 (D. Kan. July 18, 2011) (quotation marks and citation omitted).

## 2. Negligent Misrepresentation

Plaintiffs alternatively argue that "[i]f the Court is not convinced that the Defendant knew it was delivering nonconforming feed with the intent to deceive" (as alleged in their claim for fraud), "then Plaintiffs are still entitled to summary judgment" on their claim for negligent misrepresentation. (Doc. 73 at 6.) To establish a claim for negligent misrepresentation, Plaintiffs must prove five elements: "(i) an untrue statement[;] . . . (ii) made by one who has no reasonable ground for believing the statement was true[;] . . . (iii) on which the speaker intends the listener to rely[;] . . . (iv) and on which the listener relied[;] . . . and (v) such reliance caused harm to the listener . . . ." *Carroll v. Los Alamos Nat. Sec., LLC*, 704 F. Supp. 2d 1200, 1213–14 (D.N.M. 2010), *aff'd*, 407 F. App'x 348 (10th Cir. 2011) (citations omitted).

Again, the Court stops at the first element, as neither party adequately supports its contention that the label represents a guarantee that it contained *only* the ingredients listed, or *at least* the ingredients listed. Accordingly, the Court will deny Plaintiffs' motion on the issue of negligent misrepresentation.

## G. Unfair, Deceptive, and Unconscionable Trade Practices under the UPA

Plaintiffs contend that the Defendant's failure to deliver the feed formulation contracted for violated the UPA. (*See* Doc. 73 at 8.)

> To state a claim under the NMUPA, the plaintiff must show: (1) that the defendant made an oral or written statement, visual description, or other representation that was either false or misleading; (2) that the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of the representer's trade or commerce; and (4) the representation is of the type that may, tends to or does, deceive or mislead any person.

*Navajo Nation v. Urban Outfitters, Inc.*, 935 F. Supp. 2d 1147, 1172–73 (D.N.M. 2013) (citing *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (1991)). As with the parties' disagreement

regarding Plaintiffs' fraud and negligent misrepresentation claims, there is an issue of fact about whether Defendant's label was "false or misleading." Defendant contends that it "did not commit any misrepresentation or unfair trade practice as it is undisputed that the feed Plaintiffs received contained *at least* all the ingredients stated on the guaranteed analysis on the label, so the feed order conformed with the label." (Doc. 81 at 11.) As Plaintiffs fail to discuss any other facts or legal authority regarding the remaining elements, the Court will deny their motion with respect to the UPA claim.

### H.      Breach of Contract and Breach of Implied Warranty of Merchantability

Plaintiffs assert that Defendant "was under a contractual obligation to Plaintiffs . . . to provide the specified feed, unadulterated, free from contamination, properly labeled, and in[ ] compliance with its custom formulation." (Compl. ¶ 34.) They also claim that Defendant had an "obligation to comply with express and implied warranties[,]" including warranties "that its feed would be consistent with its custom formulation, would be of a merchantable quality[,] and would be fit for its intended uses." (*Id.* ¶ 35.) Plaintiffs allege that Defendant breached both the parties' contract and the implied warranty of merchantability by delivering adulterated feed. (*See id.* ¶¶ 34–35; *see also* Doc. 73 ¶ 8 (asserting that "almost two tons . . . of foreign matter was dumped into" Plaintiffs' feed, including feed containing monensin) (citing Doc. 73-8 at 28:1–15).)

Under this Court's Local Rules, a party moving for summary judgment must "file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon (the 'Memorandum')." D.N.M. LR-Civ. 56.1(b). Here, Plaintiffs fail to provide any "reasons in support of [their] motion" with respect to these claims, *see id.*; instead, they merely quote the jury instructions for breach of contract and breach of implied warranties claims. (*See* Doc. 73 at 14–15.) Plaintiffs fail to apply the law to the facts,

and the Court will not create arguments for them. Defendant supports its arguments with citations to the record, but Plaintiffs did not deign to reply to Defendant's arguments in their reply brief. (*See* Docs. 81 at 14–15; 83 at 9.) Based on Plaintiffs' insufficient briefing alone, the Court would deny Plaintiffs' motion on the breach of contract and breach of implied warranties claims.

Plaintiffs have a more serious problem, however, as both of these claims include a causation element. "Under New Mexico law, '[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, *causation*, and damages.'" *Am. Mech. Sols.*, 184 F. Supp. 3d at 1067 (quoting *Abreu v. N.M. Children, Youth & Families Dep't*, 797 F.Supp.2d 1199, 1247 (D.N.M. 2011) (internal citation omitted) (emphasis added)). And "[i]n an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and *that the breach of the warranty was the proximate cause of the loss sustained*." *Id.* at 1069 (quoting N.M. Stat. Ann. 1978, § 55-2-314 cmt. 13) (citing *Jesko v. Stauffer Chemical Co.*, 558 P.2d 55, 57 (N.M. Ct. App. 1976) ("holding that under New Mexico law, in a suit asserting breach of express and implied warranties, and breach of contract, the plaintiff set forth sufficient evidence to support the finding that the chemical Eradicane caused damage to corn crops") (subsequent citations omitted)). "In other words, to maintain a breach of the implied warranty of merchantability claim under New Mexico law, a plaintiff must prove that the breach of the warranty proximately caused the plaintiff's damages." *Id.* (citing *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1196 (N.M. 1995) ("The party relying on the breach of warranty must prove the existence of a warranty, the breach thereof, causation, and damages."), *overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Co-op., Inc.*, 301 P.3d 387 (N.M. 2013)). As Plaintiffs cannot establish causation, the Court will dismiss

both claims. Consequently, the Court need not reach a decision on Defendant's motion with respect to the breach of contract claim as to Ms. Derrick only.

**V.        The Court will deny Defendant's request for sanctions.**

Defendant asks the Court to sanction Plaintiffs with dismissal for their failure to perform testing on their horses. (Doc. 58 at 13–16.) Putative litigants are under an "obligation to preserve evidence . . . when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC* (*Zubulake 1*), 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d. Cir. 2001) (internal and subsequent citations omitted)); *see also U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *2 (D.N.M. Aug. 31, 2012). The Tenth Circuit specifies that this duty to preserve evidence arises at the time litigation is "imminent." *Baker*, 2012 WL 12294413, at *3 (citing *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (internal citation omitted)). "Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." *Baker*, 2012 WL 12294413, at *3 (quoting *U.S. ex rel. Koch v. Koch Indus., Inc.*, 197 F.R.D. 488, 490 (N.D. Okla. 1999)). To prevent spoliation, "the general rule is that '[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents.'" *Id.* at *2 (quoting *Zubulake 1*, 220 F.R.D. at 218). The same "litigation hold" also applies to tangible evidence, such as the feed or horses at issue here. *See, i.e.*, *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912, 1998 WL 68879, at *7 (10th Cir. Feb. 20, 1998) (affirming district court's imposition of sanctions on party for losing damaged landing gear, an examination of which was crucial to the opposing party's defense).

Counsel for the parties have a continuing responsibility to ensure that the parties preserve relevant information. *Baker*, 2012 WL 12294413, at *2 (citation omitted). "At the end of the day, however, the duty to preserve and produce documents rests on the party." *Zubulake v. UBS Warburg LLC* (*Zubulake 2*), 229 F.R.D. 422, 436 (S.D.N.Y. 2004).

"Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Turner*, 563 F.3d at 1149 (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007) (internal citation omitted)). "When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party." *Baker*, 2012 WL 12294413, at *3 (quoting *Patten v. Target Corp.*, No. 08-CV-01043-REB-KMT, 2009 WL 1279331, at *3 (D. Colo. May 6, 2009) (internal citation omitted)).

Defendant contends that it should have been clear to Plaintiffs that litigation was imminent and that they had a duty to preserve evidence regarding the horses. Plaintiffs assert that since December 2016, six of their horses have died (and many more have been injured), allegedly from eating feed tainted with monensin. (Doc. 58 at 15 (citing Doc. 58-D at 153:14–21, 180:4–18).) Plaintiffs filed their Complaint in state court on November 2, 2017 (*see* Compl.), and at least one horse has died since that time (*see* Doc. 58-D at 178:12–18 (Mr. Derrick testifying that they lost another horse "almost a year to the date in December")). Despite Plaintiffs' knowledge that they would file a lawsuit, and later, that they were actively involved in litigation, and despite instructions from their veterinarian that there would "have [to] be fresh deaths in order to learn any more than [what] was learned from the first two" (Doc. 100 at 6), Plaintiffs did not have the

horse sense to obtain any kind of testing that would provide support for their theory. (*See*, *e.g.*, Doc. 58-D at 179:6–181:9, 182:14–184:21.)

However, "even assuming that Plaintiffs should have preserved" evidence from the living and/or deceased horses, "sanctions are not appropriate as [Defendant] has not established prejudice." *Fairfield Dev., Inc. v. J.D.I. Contractor & Supply, Inc.*, No. 08-CV-02792-MSK-KMT, 2010 WL 3023822, at *4 (D. Colo. July 30, 2010). Defendant asserts that Plaintiffs' failure to preserve evidence about the horses has prejudiced it because such evidence was necessary "for Defendant to adequately defend this case." (Doc. 58 at 16.) Yet, "the same evidence is available to all parties." *See Fairfield Dev.*, 2010 WL 3023822, at *4. Plaintiffs have harmed their own case with their lack of due diligence in securing either expert testimony and/or additional direct evidence of feed and tissue samples, as shown by the Court's dismissal of most of the claims at issue here. With respect to the remaining counts, both parties will have access to the currently available evidence to both prove and defend the claims.

Further, Defendant has not even attempted "to establish a reasonable probability, based on concrete evidence rather than a fertile imagination, that" testing of the horses "would have produced evidence favorable to" its defense. *See id.* at *2, 5 (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996) (alterations in original) (internal quotations omitted)); *see also Lundstrom v. Albuquerque Police Officers*, No. CIV. 07-0759 JH/WDS, 2008 WL 8095957, at *1 (D.N.M. May 14, 2008) (denying motion for sanctions because plaintiffs had "not met their burden to establish a reasonable possibility, based on concrete evidence, that the report would have produced evidence favorable to [their] claims"). Because Defendant does not support its motion with concrete evidence that testing would be favorable to the defense, the Court

will deny its motion for sanctions. Plaintiffs' potential for failure to prove the remainder of their case will be sanction enough.

THEREFORE,

**IT IS ORDERED** that Defendant Standard Nutrition Company's Motion for Summary Judgment, filed on September 27, 2018 (Doc. 58), is **GRANTED IN PART**. The Court will **DISMISS** Plaintiffs' claims for negligence, negligence per se, strict products liability, cruelty to animals, NIED, breach of contract, and breach of implied warranty of merchantability. The Court will **DENY** Defendant's motion for sanctions;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, filed on December 3, 2018 (Doc. 73), is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Expert Testimony of Dr. Ronald Box Pursuant to April 16, 2019 Court Order (Doc. 106) is **GRANTED IN PART** as detailed in this Opinion.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE