## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RONNY DERRICK and ANGIE
DERRICK, a married couple,

      Plaintiffs,

v.                                        No. CIV 17-1245 RB/SMV

STANDARD NUTRITION COMPANY, a
Nebraska Corporation, dba A-C Nutrition, LP,
a Texas limited partnership; JOHN DOES 1–5;
and XYZ Corporate or Business Entities 1–5,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Ronny and Angie Derrick (Plaintiffs), owners of a horse breeding program, have brought suit against Standard Nutrition Company (Defendant), a manufacturer of animal feed. Plaintiffs contend that Defendant manufactured and sold them feed contaminated with a substance (monensin) that caused injury and death to many of their horses. On May 8, 2019, the Court granted in part Defendant's motion for summary judgment and dismissed several of Plaintiffs' claims due to their failure to secure a causation expert to support their theory that their horses were injured or died due to the alleged monensin poisoning. (*See* Doc. 113.) Plaintiffs have moved the Court to reconsider its May 8, 2019 Memorandum Opinion and Order. (*See* Docs. 119 at 1–19; 120.)

Plaintiffs also ask the Court to reconsider United States Magistrate Judge Stephan M. Vidmar's decision in an April 12, 2019 Memorandum Opinion and Order (Doc. 104), which denied Plaintiffs' motion for sanctions based on spoliation of evidence. (*See* Docs. 119 at 19–24; 68.)

Defendant asks the Court to strike Plaintiffs' motions because they are untimely and do not comply with local rules, they are based on unauthenticated and inadmissible hearsay evidence, and they are based on evidence and arguments that have been presented to the Court previously. (*See*

Doc. 123.) Defendant has also filed a motion in limine seeking "an evidentiary ruling that bars any evidence, argument, or reference to horse deaths, horse injuries, emotional distress, or monetary damage at trial." (*See* Doc. 115 at 2.) Plaintiffs have failed to file a response to this motion.

For the reasons explained below, the Court will grant Plaintiffs' motion to supplement (Doc. 120) and will consider the attached exhibits, deny Plaintiffs' motion to reconsider (Doc. 119), deny Defendant's motion to strike as moot (Doc. 123), and grant Defendant's motion in limine as unopposed (Doc. 115).

## I.    Legal Standard

Plaintiffs ask the Court to reconsider its rulings pursuant to Federal Rules of Civil Procedure 59 and 60. (Doc. 119 at 2.) These two rules, however, apply to motions filed after judgment has been entered and do not provide a basis for the relief Plaintiffs seek. *See Anderson Living Tr. v. WPX Energy Prod., LLC*, 312 F.R.D. 620, 642 (D.N.M. 2015) (discussing three categories of motions to reconsider); *accord Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005). Because the "Court's partial summary judgment ruling was not a final judgment[,]" Plaintiffs' motion to reconsider "is considered 'an interlocutory motion invoking the [Court's] general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment.'" *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008) (quoting *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991)). Such authority stems from Federal Rule of Civil Procedure 54(b). *See Price*, 420 F.3d at 1167 n.9.

"Rule 54(b) provides that a district court can freely reconsider its prior rulings." *Med Flight Air Ambulance, Inc. v. MGM Resorts Int'l*, No. 17-CV-0246 WJ/KRS, 2018 WL 1997292, at *5 (D.N.M. Apr. 27, 2018) (citing *Lujan v. City of Santa Fe*, 122 F. Supp. 3d 1215, 1238 (D.N.M. 2015)). "In addition, the rule 'puts no limit or governing standard [on] the district court's ability

to do so, other than that it must do so before the entry of judgment.'" *Id.* (quoting *Lujan*, 122 F. Supp. at 1238 (internal quotation marks omitted)). The Tenth Circuit has stated that a district court "*may* look to the standard used to review a motion made pursuant to . . . Rule 59(e)[,]" *Ankeney v. Zavaras*, 524 F. App'x 454, 458 (10th Cir. 2013) (emphasis added), but it "has not cabined district courts' discretion beyond what [R]ule 54(b) provides[,]" *Lujan*, 122 F. Supp. at 1238 (citing *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1225 (10th Cir. 2007)). Thus, in revisiting a previous order in *Med Flight Air Ambulance*, United States Chief District Judge William P. Johnson was "guided by concerns of judicial economy, avoiding piecemeal litigation, and the posture of all the parties involved." *See* 2018 WL 1997292, at *6. And in *Lujan*, United States District Court Judge James O. Browning considered (1) "how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenge[d]"; (2) "the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties . . . produce[d]"; and (3) the grounds courts use to consider a motion to reconsider brought under Rule 59(e). 122 F. Supp. 3d at 1238–39; *see also Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). The Court finds that, regardless of the standard it uses, Plaintiffs' motion to reconsider should be denied.

## II.     Plaintiffs have identified no reason sufficient for the Court to reconsider its decision on the parties' motions for summary judgment.

Plaintiffs assert that the Court should reconsider its rulings on summary judgment because: (1) they have introduced "new and previously unavailable scientific evidence that irrefutably establishes causation"; (2) they submitted evidence that was previously available, inadvertently omitted, and creates a dispute of fact; (3) the Court erred in restricting Dr. Box's testimony. (*See* Doc. 119.) Plaintiffs have failed to persuade the Court that it should amend its rulings.

## A. The Court will deny Plaintiffs' motion to reconsider pursuant to the Rule 59(e) standard of review.

"Grounds for granting a motion to reconsider pursuant to Rule 59(e) include: '(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.'" *Ankeney*, 524 F. App'x at 458 (quoting *Servants of the Paraclete*, 204 F.3d at 1012). As Plaintiffs have not cited an intervening change in the controlling law, the Court will analyze their motion only under the second and third grounds.

### 1. Plaintiffs fail to establish that any "new" evidence was previously unavailable.

Plaintiffs contend that the lab reports submitted to the Court on June 6, 2019, constitute "new" evidence previously unavailable and provide sufficient grounds for reconsideration of the Court's ruling on summary judgment. (*See* Doc. 119 at 1, 3, 19.) A look at the factual and procedural history of this litigation precludes such a finding. Plaintiffs discovered the first two deceased horses in December 2016, and the second two deceased horses five and seven days later, also in December 2016. (*See* Doc. 58-D at 153:15–19, 162:23–163:8, 179:2–5, 180:10–15.) Dr. Box took tissue samples from the first two horses, but the samples had broken down too much to yield conclusive results regarding their cause of death. (Docs. 58-F at 3, 6; 73-5 at 2.) Dr. Box informed Plaintiffs that there would "have [to] be fresh deaths in order to learn any more'" about what had harmed the horses. (Doc. 100 at 6.) Despite the fact that Plaintiffs filed this lawsuit in November 2017, Plaintiffs disregarded Dr. Box's instructions and failed to perform any testing on the next two horses that died in December 2017. (*See* Docs. 58-D at 153:14–21, 180:4–18; 100 at 3 (admitting Defendant's Material Fact No. 14 that Plaintiffs did not have the horses that died in December 2017 evaluated, necropsied, or sampled).)

Judge Vidmar entered the Scheduling Order in May 2018 and set October 29, 2018, as the termination date for discovery. (*See* Doc. 25 at 2.) On October 22, 2018, Plaintiffs filed an untimely motion to amend the scheduling order to extend the expert report deadline and argued that the "Scheduling Order should be amended to allow for completion of fact discovery and expert analysis." (*See* Doc. 65 at 7; *see also* Doc. 66 (Mem. Op. & Order denying Mot. to Am.).) Plaintiffs mentioned a need to complete the depositions of certain witnesses, but they did not note any plans to euthanize horses to obtain lab results. (*See id.* at 6–7.)

On November 16, 2018, in response to Defendant's motion for summary judgment, Plaintiffs' counsel, Mr. Laurence Berlin, filed a Rule 56(d) declaration and asked the Court to "defer considering the motion" until the parties had completed three depositions and Defendant had disclosed certain documents. (*See* Doc. 67 at 1 n.1.) Again, Plaintiffs did not mention any plans to euthanize horses. (*See id.*) Plaintiffs never sought leave to file a late substantive response to the motion for summary judgment. Rather than granting the motion for summary judgment as unopposed pursuant to Local Rule 7.1(b), *see* D.N.M. LR-Civ. 7.1(b), the Court on March 20, 2019, ordered Plaintiffs to respond. (Doc. 96.) After requesting an extension (*see* Doc. 98), Plaintiffs responded on April 1, 2019. (Doc. 100.) It is in this brief that Plaintiffs first mentioned they had euthanized two horses on March 29, 2019, and expected results from tissue samples "shortly." (*Id.* at 5.) Defendant filed a reply to its motion for summary judgment on April 8, 2019. (Doc. 102.)

Also on April 8, 2019, the Texas A&M Veterinary Medical Diagnostic Laboratory (TVMDL) released its report on the analysis of one of Plaintiffs' euthanized horses. (*See* Doc. 120-1 at 2.) Plaintiffs did not file a motion seeking leave of the Court to file a supplemental brief to introduce this new evidence.

Defendant filed a motion to exclude Plaintiffs' proposed expert, Dr. Box, on April 22, 2019. (Doc. 106.) Plaintiffs filed two responses to this motion. (Docs. 107; 110.) In each response, Plaintiffs alluded to the TVMDL lab report, but they failed to attach the report to their responses.[1] (*See* Docs. 107 at 3; 110 at 4.) Accordingly, the Court did not consider the lab report in its ruling on the parties' motions for summary judgment. (*See* Doc. 113 at 3 n.2.)

In their motion to reconsider, Plaintiffs assert that they gave Defendant notice that one or more of the horses would need to be euthanized "months" before they actually euthanized the horses. (Doc. 119 at 4.) Mr. Berlin stated to the Court that he "informed opposing counsel of the impending need to euthanize horses" in late January 2019. (*See* Doc. 107 at 3 n.2.) Thus Plaintiffs knew as early as January 2019 that they would euthanize a horse and would potentially have relevant evidence to introduce regarding causation, but they did not alert the undersigned.

In short, Plaintiffs declined to evaluate tissue samples from at least one horse that died naturally in 2017. Lacking conclusive evidence of the damage done by the alleged monensin exposure, they delayed making the admittedly hard decision to euthanize one of their remaining affected horses until after discovery had closed and the dispositive motions deadline had passed. Yet, even after they made that decision in January 2019, they waited approximately two months to euthanize the horse. And even more damning to their cause now, after they received the evidence that they argue "irrefutably establishes causation"[2] (Doc. 119 at 1), they waited another two

---

[1] Mr. Berlin asserts that he was "able to attach the Pathology Report toward the end of the briefings, [but] neither Defendant[] nor the Court addressed it . . . ." (Doc. 126 at 7 (citing Doc. 107); *see also* Doc. 127 at 1–2.) Mr. Berlin did *not* attach the lab report to either of his responses to Defendant's motion to exclude Dr. Box. (*See* Docs. 107; 110.) To the extent Mr. Berlin references a block quote on page 3 of his response that he attributed to the lab report, a block quote from an undisclosed exhibit is not an exhibit. (*See* Doc. 107 at 3.)

[2] Defendant disagrees that the evidence "irrefutably establishes causation," as it is a report on only "one of the 20 horses at issue in this case" and "merely states that one of the lesions found . . . 'has been associated with' exposure to monensin." (Doc. 125 at 3 (citing Docs. 119 at 1–2; 1 at 5; 120-1 at 3).) "It does not say

months before submitting that evidence to the Court. They had an opportunity to supplement the evidence to support their motion for summary judgment. They had *another* opportunity to supplement the record in response to Defendant's motion to exclude Dr. Box. But Plaintiffs chose to wait until after the Court had ruled on their dispositive motions. Their late revelation of the evidence does not mean that it was "previously unavailable," it was simply tardy.

### 2. Plaintiffs fail to demonstrate clear error or manifest injustice.

"The Tenth Circuit has defined 'clear error' as 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Thymes v. Verizon Wireless, Inc.*, No. CV 16-66 KG/WPL, 2016 WL 9777487, at *2 (D.N.M. Sept. 28, 2016) (quoting *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1236 (10th Cir. 2001)). "Although the Tenth Circuit has not specifically defined 'manifest injustice' in the Rule 59(e) context, other courts have defined manifest injustice as 'more than just a clear and certain prejudice to the moving party, but also a result that is fundamentally unfair in light of governing law.'" *Id.* (quoting *Smith v. Lynch*, 115 F. Supp. 3d 5, 12 (D.D.C. 2015); citing *In re Green Goblin, Inc.*, Bankr. No. 09-11239 ELF, 2012 WL 1971143, at *1 (Bankr. E.D. Pa. May 31, 2012) ("In order for a court to reconsider a decision due to 'manifest injustice,' the record presented must be so patently unfair and tainted that the error is manifestly clear to all who view it.")). Plaintiffs do not explicitly argue that the Court's decision was arbitrary, capricious, or fundamentally unfair. (*See* Doc. 119.) Instead, they assert: (1) reconsideration is appropriate in light of their late introduction of certain pages of an exhibit that they inadvertently omitted from their response to Defendant's motion for summary judgment (*id.* at 10–11); and (2) the Court erred in limiting Dr. Box's testimony and in not admitting the new evidence (*id.* at 16–18). The Court will take up the matter of Dr. Box's testimony and the new evidence first.

---

definitely that the lesion *is* associated with a prior monensin exposure, let alone the alleged monensin exposure at issue back in December of 2016." (*Id.* (citing Doc. 120-1 at 3).)

With respect to this issue, Plaintiffs first contend that the Court should admit the new evidence and Dr. Box's expert testimony pursuant to *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.*, 170 F.3d 985 (10th Cir. 1999). (*Id.* at 15.) Second, they argue that regardless of whether Dr. Box testifies as an expert or as a treating veterinarian, he should be allowed to opine about causation and diagnosis. (*Id.* at 16–19.)

**Consideration of the *Woodworker's* factors supports exclusion of Dr. Box as an expert and of the new evidence.**

Plaintiffs acknowledge that they failed to disclose Dr. Box as an expert witness in violation of Federal Rule of Civil Procedure 26(a)(2). (*See*, *e.g.*, *id.* at 15.) They urge the Court to allow Dr. Box to testify as an expert and to admit the late evidence, however, because the violations were harmless. (*See id.*; *see also* Doc. 107 at 7–8.) "District courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Leon v. FedEx Ground Package Sys., Inc.*, No. CIV 13-1005 JB/SCY, 2016 WL 1158079, at *7 (D.N.M. Mar. 1, 2016) (citations omitted). "On the other hand, a district court may 'refuse to strike expert reports and allow expert testimony even when the expert report violates Rule 26(a) if the violation is justified or harmless.'" *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 952 (10th Cir. 2002)); *see also* Fed. R. Civ. P. 37(c).

> [T]he Tenth Circuit has identified four factors that a district court should consider when deciding whether to exclude expert evidence: "[i] the prejudice or surprise to the party against whom the testimony is offered; [ii] the ability of the party to cure the prejudice; [iii] the extent to which introducing such testimony would disrupt the trial; and [iv] the moving party's bad faith or willfulness.

*Leon*, 2016 WL 1158079, at *7 (quoting *Ellsworth v. Tuttle*, 148 F. App'x. 653, 665 (10th Cir. 2005) (quoting *Woodworker's Supply, Inc.*, 170 F.3d at 993)). The Tenth Circuit has applied these same factors where a party failed to timely disclose evidence regarding damages. *See HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1196–97 (10th Cir. 2017).

Plaintiffs contend that there is no prejudice or surprise to Defendant, as they have already taken Dr. Box's deposition. (*See* Doc. 110 at 12.) As Defendant points out, however, the parties took Dr. Box's deposition on January 10, 2019, "over four months past [the August 29, 2018] expert disclosure deadline[,] . . . over several objections by Defense Counsel[,]" and more than two months after Judge Vidmar denied Plaintiffs' motion to amend the scheduling order. (Doc. Doc. 106 at 4.)

Defendant further asserts that Plaintiffs "improperly solicited numerous additional undisclosed expert opinions from Dr. Box at his . . . deposition" that were not noticed via the one-page letter Plaintiffs try to spin as an expert report. (*Id.*; *see also* Doc. 101-2.[3]) The Court has compared the one-page letter with Dr. Box's deposition testimony and agrees that Plaintiffs far exceeded the scope of the letter. In his letter, Dr. Box stated that "on autopsy all I can truthfully say is there was no colic. The 2 horses were found near each other and did not appear to struggle. They were undergoing severe autolysis." (*See* Doc. 101-2.) He stated that he sent heart and liver samples to the lab, but because of the severe autolysis, he "cannot prove . . . that these horses died of monensin." (*Id.*) He also sent stomach content samples that were negative for monensin, but the lab told him that the drug might have "already cleared the stomach." (*Id.*) He stated that he caught feed from the overhead bulk tank and sent it in for testing and that "it was positive for monensin at 1.2 ppm." (*Id.*) He opined that "even though it is at a very low level" and he "cannot testify [to] the concentration of the monensin [in] the feed that the horses ate[,]" it is his "professional opinion [that] the horses died of monensin toxicity." (*Id.*)

At his deposition, over objections from Defendant, Mr. Berlin elicited testimony from Dr. Box about (1) whether a pattern of horse deaths might be consistent with a history of monensin

---

[3] The Court has already ruled that Dr. Box's letter (Doc. 101-2) does not qualify as an expert report under Rule 26(a)(2)(B). (*See* Doc. 113 at 2 n.1.)

toxicity; (2) "lethal" and "sub-lethal" doses of monensin; (3) whether monensin can filter and concentrate in certain areas of feed; (4) what should be done to clean trucks between delivery of different types of feed; (5) his opinions of how the living horses on the ranch looked when he went to examine the deceased horses; (6) how the appearance of the living horses might be consistent with monensin poisoning; (7) whether exposure to monensin could affect the value of horses; and (8) whether from what he knows about monensin and his past experiences as a veterinarian, the circumstances in this case lead him to believe that the horses died of monensin toxicity. (*See* Doc. 106-A.) These areas of testimony were not disclosed in the one-page letter, and Defendant did not have an opportunity to prepare for these questions in time for the January 2019 deposition.

Even more prejudicial to Defendant, Plaintiffs seek to have Dr. Box testify about lab reports obtained three months after his January 2019 deposition, almost six months after discovery ended, four months after the dispositive motions deadline passed, and not disclosed to the Court until less than two months before trial was scheduled.[4] There is no evidence that Plaintiffs have ever supplemented their "expert report" or discussed the possibility of a follow-up deposition with Dr. Box to cure this prejudice. "The purpose of Rule 26(a)(2)'s expert disclosure requirements is to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and

---

[4] Plaintiffs urge the Court to apply "*the same ruling* to the recent [TVMDL] lab report" that it applied to the original lab report. (Doc. 119 at 14.) The Court previously held that, "[i]f he testifies at trial, Dr. Box may, *without objection*, read the results of the lab reports Plaintiffs received as a result of the samples he took in December 2016." (Doc. 113 at 4 (emphasis added).) The ruling is subject to a qualification—*Defendant is free to object* to a reading of the original lab report, and the Court will rule on any objection as needed. Defendant's Motion in Limine, to which Plaintiffs have failed to file a response, implicitly objects to Dr. Box's reading of the 2016 report. (*See* Doc. 115 at 2; *see also infra* at Section IV.)
Assuming the Court were to apply the same ruling to the new lab report—that Dr. Box may, without objection, read the 2019 lab report results, Defendant has already filed its objection. Defendant moved to strike the 2019 lab report on the basis that it "constitutes hearsay and . . . is not authenticated by any affidavit or other evidence that would support its admission." (Doc. 123 at 3 (citing Fed. R. Evid. 801(c), 901(a)).) Plaintiffs have failed to substantively address this objection with reference to any controlling authority in their response. (*See* Doc. 126 at 6–7 n.5.)

trial." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1122 (D. Colo. 2006) (citing *Sylla-Sawdon v. Uniroyal Goodrich Tire. Co.*, 47 F.3d 277, 284 (8th Cir. 1995); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 682 (D. Kan. 1995)). Defendant was prejudiced in each of these areas. The first *Woodworker's* factor heavily leans in favor of excluding both Dr. Box's expert testimony and the new evidence.

Regarding the second *Woodworker's* factor, there is now little time to cure the prejudice to Defendant, as trial is set for next month. "Prejudice results because the expert reports did not reveal what the experts will testify to at trial." *Jacobsen*, 287 F.3d at 954. The circumstances here are distinguishable from those where the Tenth Circuit has "determined that a party's failure to produce a written expert report in compliance with rule 26(a)(2)(B) did not warrant the extreme sanction of excluding the expert's testimony." *Leon*, 2016 WL 1158079, at *8 (discussing *Gillum v. United States*, 309 F. App'x 267 (10th Cir. 2009)). In *Gillum*, the district court excluded an expert report on the grounds that the opposing party (the United States) was prejudiced and "the prejudice could not be cured on the premise that the United States had 'only . . . one chance to confront that expert'" at deposition, and "that opportunity is now gone permanently in this case." *Id.* (quoting *Gillum*, 309 F. App'x at 269–70). The Tenth Circuit reversed because the district court's hearing on the issue of the expert report was held *before discovery ended*—thus, there was time for the United States to undertake a second deposition with a supplemented expert report. *See Gillum*, 309 F. App'x at 270. Here, the parties deposed Dr. Box after discovery ended, and Plaintiffs continued to search for evidence and elicit more expert opinions from Dr. Box both after discovery had ended and after the parties had briefed dispositive motions. Plaintiffs had multiple opportunities to cure the prejudice before now. They could have euthanized the horses prior to the discovery or dispositive motion deadline. They could have moved the Court to extend the

discovery or dispositive motion deadline. They could have appealed, pursuant to Federal Rule of Civil Procedure 72(a), Judge Vidmar's denial of the motion to amend the scheduling order. *See United States v. Copar Pumic Co., Inc.*, Civ. No. 09-1201 JAP/KBM, 2012 WL 12910521, at *4 (D.N.M. June 18, 2012) (noting that Rule "72(a) allows a district judge to consider timely objections and modify or set aside any part of a magistrate judge's decision on a non-dispositive issue that is clearly erroneous or is contrary to law") (citations omitted)). They could have filed a supplement to the "expert report" and offered to depose Dr. Box again after they euthanized the horses. Ultimately, Plaintiffs offer no evidence to show that they took steps to cure the prejudice to Defendant, and this factor weighs heavily in favor of exclusion of Dr. Box's expert testimony and of the new evidence.

Trial is set for July 29, 2019, one month from now. The Court finds that admitting the untimely evidence or allowing Dr. Box to testify as an expert to the extent Plaintiffs request would significantly disrupt the trial and prejudice Defendant. In *Quapaw Tribe of Oklahoma v. Blue Tee Corp.*, No. 03-cv-0846-CVE-PJC, 2010 WL 3909204, at *5 (N.D. Okla. Sept. 29, 2010), the court found that where trial was two months away, the third *Woodworker's* factor favored exclusion of untimely supplemental expert reports, because admission of the untimely reports would require the defendants to re-depose their own expert "and obtain their own updated expert reports . . . ." The same is true here. (*See* Doc. 125 at 5–6.) Instead, the Court ruled that it would allow Dr. Box to testify as a treating veterinarian and would limit his testimony to his initial visit to Plaintiffs' ranch. The third factor also weighs in favor of excluding Dr. Box's expert testimony and of the new evidence.

Regarding the fourth factor, the Court hesitates to find that Plaintiffs acted in bad faith. However, the Court cannot find that Plaintiffs acted in *good* faith given their decisions to wait until

months after the discovery deadline to obtain evidence that "irrefutably establishes causation" (Doc. 119 at 1), to fail to submit the new evidence to the Court for approximately two months after obtaining it and only after the Court ruled on dispositive motions, and to continuously disregard deadlines, the scheduling order, and the Local Rules of this Court. *See Jacobsen*, 287 F.3d at 954 (finding that a party's "good faith alone would not be enough to overcome the other factors"). (*See also infra* at Sec. III(B).) Moreover, the Court finds that Plaintiffs' conduct demonstrates willfulness when Judge Vidmar has *twice* warned them in the past about the need to timely secure evidence. (*See* Docs. 41 at 3 (Judge Vidmar reminding Plaintiffs that they "may not wait until the eve of trial to disclose new evidence they intend to rely on at trial"); 66 at 7 (Judge Vidmar admonishing plaintiffs for waiting until close to the termination date for discovery to obtain certain testing of their living horses; "[i]f testing was necessary, that should have been done at the beginning of the case, not the month before the expert disclosure deadline").)

Plaintiffs urge the Court to consider lesser sanctions, as the exclusion of Dr. Box as an expert and the new evidence will "effectively kill the case . . . ." (*See* Doc. 127 at 9 (discussing *HCG Platinum, LLC*, 873 F.3d at 1203).) Essentially, Plaintiffs want the Court to save their case after they have failed, time and again, to adhere to the Court's deadlines and scheduling orders and to make more prudent litigation choices. But because Plaintiffs' pattern of conduct in this lawsuit is indicative of willfulness, the Court finds that lesser sanctions would not be proper. *See Sender v. Mann*, 225 F.R.D. 645, 657 (D. Colo. 2004) (Plaintiffs "should not be permitted to ignore [their] disclosure obligations throughout the discovery period and then avoid sanctions simply by claiming [their] deficiencies were not willful."). The four *Woodworker's* factors only serve to support the Court's earlier findings. The Court finds that Plaintiffs' failures to timely obtain and disclose evidence and to disclose Dr. Box as an expert pursuant to Rule 26(a)(2) were not justified

or harmless, and both Dr. Box's expert testimony and the new evidence should be excluded under Rule 37(c).

### **Plaintiffs have failed to demonstrate that Dr. Box should be allowed to testify to causation as a treating veterinarian.**

Plaintiffs argue that even if Dr. Box is not allowed to testify as an expert, he should still be able to testify to his diagnosis or causation as a treating veterinarian. (*See* Doc. 119 at 16–19.) Plaintiffs contend that the Court relied on medical malpractice cases in limiting Dr. Box's testimony to his involvement on the day he examined Plaintiffs' horses, when it should instead have examined products liability cases. (*See id.*) The Court declines to reconsider its opinion on this ground for two reasons.

First, the Court notes that "it is not appropriate to . . . advance arguments that could have been raised in prior briefing." *Servants of Paraclete*, 204 F.3d at 1012 (citing *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)). Plaintiffs never briefed an alleged "distinction between application of Rules of Evidence 701 and 702 to medical malpractice cases and . . . products liability case[s]." (Doc. 119 at 16; *see also* Docs. 106; 110.) In fact, the Court cited several cases that Plaintiffs relied on in their own briefs on this issue. (*Compare* Doc. 113 at 2–5 (discussing *Peshlakai v. Ruiz*, No. CIV 13-0752 JB/ACT, 2013 WL 6503629 (D.N.M. Dec. 7, 2013)), 4 (citing *Davoll v. Webb*, 194 F.3d 1116, 1138–39 (10th Cir. 1999)), 5 (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1215 (10th Cir. 2011)), 14 (citing *United States v. Henderson*, 409 F.3d 1293, 1296, 1299–1300 (11th Cir. 2005)); *with* Doc. 110 at 7–9 (discussing *Peshlakai*), 9 (discussing *Davoll*), 11 (discussing *James River* and *Henderson*).) Plaintiffs now cite to two cases that they did not mention in their first two briefs. (*See* Doc. 119 at 16 (citing *Guerrero v. Meadows*, 646 F. App'x 597 (10th Cir. 2016)), 18 (citing *Williams v. Mast*, 644 F.3d 1312 (11th Cir. 2011)).) Plaintiffs had the opportunity to bring these cases to the Court's

attention previously and did not. "A motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *United States v. Loera*, 182 F. Supp. 3d 1173, 1209 (D.N.M. 2016), *aff'd*, 923 F.3d 907 (10th Cir. 2019) (quoting *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan. 1994)).

Even if the Court had considered Plaintiffs' argument originally, it would have made the same decision. Plaintiffs essentially argue that courts allow treating physicians to testify about causation and diagnosis where they rely only on their own treatment, and not on the records of other physicians. (Doc. 119 at 16–17 (discussing *Guerrero*, 646 F. App'x at 602 (finding that district court properly excluded treating physician's testimony about causation because he only treated the plaintiff's complaints of headaches, and another physician diagnosed the neurological conditions that caused the headaches).) If this were true, Dr. Box would still be precluded from testifying about causation, because his opinion relies in part on the lab reports that established there was monensin in the feed. (*See* Doc. 101-2.)

Regardless, Plaintiffs misunderstand the state of the law. Judge Browning, in *Walker v. Spina*, No. CIV 17-0991 JB/SCY, 2019 WL 145626, at *17–22 (D.N.M. Jan. 9, 2019), thoroughly summarized the history and current impact of Rules 701 and 702 as they apply to treating physicians. In particular, Judge Browning examined the 2000 amendments to Rule 701, which "changed the requirements for lay testimony." *Walker*, 2019 WL 145626, at *18 (citing Jack Weinstein & Margaret Berger, *Weinstein's Federal Evidence* § 701.03[4][b], at 701–31 (J. McLaughlin ed., 2d ed. 2012)); *accord Montoya v. Sheldon*, 286 F.R.D. 602, 612–13 (D.N.M. 2012). Before the 2000 amendments, "lay witness testimony was subject to only two restrictions; lay testimony 'is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the

determination of a fact in issue.'" *Walker*, 2019 WL 145626, at *18 (quoting Fed. R. Evid. 701 (1997)). "In 2000, the language restricting lay witnesses' opinions to only opinions 'not based on scientific, technical, or other specialized knowledge within the scope of Rule 702,'" was added so that "'a party will not evade the expert witness disclosure requirements set forth in [Rule] 26 . . . by simply calling an expert witness in the guise of a lay person.'" *Id.* (quoting Fed. R. Evid. 701 advisory committee's notes; citing Weinstein & Berger, supra § 701.03[4][b], at 701–31 ("noting that the 2000 amendment to rule 701 . . . 'provides assurance that parties will not use Rule 701 to evade the expert witness pretrial requirements of [Rule] 26'")). Thus, Rule 701 now provides that:

> [a] witness not properly identified as an expert pursuant to rule 26 may . . . testify as a lay witness to opinions which are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

*Id.* (quoting Fed. R. Evid. 701). "The amendment makes clear that any part of a witness'[s] testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules." *Id.* (quoting Fed. R. Evid. 701 advisory committee's notes).

"Before the 2000 amendments, courts concluded that a treating physician testified as a lay witness when he or she testified based on his or her personal experience treating a patient." *Id.* (citing *Davoll*, 194 F.3d at 1138–39; *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996); *Piper v. Harnischfeger Corp.*, 170 F.R.D. 173, 175 (D. Nev. 1997) ("It is common place for a treating physician during, and as part of, the course of treatment of a patient to consider things such as the cause of the medical condition, the diagnosis, the prognosis and the extent of disability caused by the condition, if any.")). Courts reasoned that because "[t]reating physicians are not retained for

purposes of trial[,]"[5] their opinions regarding diagnosis and causation were "a necessary part of the treatment of the patient" and "do not make the treating physicians experts as defined by Rule 26(b)(4)(C)." *Id.* (quoting *Baker v. Taco Bell Corp.*, 163 F.R.D. 348, 349 (D. Colo. 1995)).

After the 2000 amendments, however, "a treating physician who has not been identified as an expert witness pursuant to Rule 26(a)(2) may not provide testimony beyond the scope of her treatment of plaintiff and [the physician's] conclusions must fall within the province of a lay witness." *Id.* (quoting *Parker v. Cent. Kan. Med. Ctr.*, 57 F. App'x. 401, 404 (10th Cir. 2003)). Consequently, a treating physician who was not disclosed as an expert witness "cannot testify to medical opinions regarding causation, because such opinions require knowledge derived from previous professional experience, which falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *Id.* (discussing *James River Ins.*, 658 F.3d at 1215 (internal quotation marks and brackets omitted) (subsequent citations omitted)). The distinction is aptly explained as follows:

> When the physician testifies that the plaintiff was coughing and running a fever, this is lay witness testimony governed by Rule 701. However, if the physician also testifies that he diagnosed the patient as having Reactive Airways Dysfunction Syndrome caused by exposure to a toxic chemical, then this is testimony based on scientific, technical, or other specialized knowledge and must be qualified under Rule 702.

*Id.* (quoting Stephen A. Saltzburg et. al, *Federal Rules of Evidence Manual* § 701,02[7], at 701–18 (10th ed. 2011)).

Here, the Court has ruled that Dr. Box may testify about his personal observations on the

---

[5] The fact that treating physicians are hired to treat, and not for purposes of trial, provides an additional reason to exclude Dr. Box as an expert. *See Walker*, 2019 WL 145626, at *18. Here, it is unclear whether Plaintiffs ever hired Dr. Box to treat their horses prior to the event in December 2016. More importantly, Plaintiffs' intent in hiring Dr. Box to take samples in March 2019 is crystal clear—their sole purpose was to use the lab results as evidence in this lawsuit. Thus, Dr. Box was not acting as a treating physician in that instance.

day he visited the ranch in December 2016. (*See* Doc. 113 at 3–4.) His testimony that he ruled out rattlesnake bites or evidence of locally-growing toxins is proper lay witness testimony. But any testimony about his diagnosis of monensin toxicity would be based on scientific, technical, or other specialized knowledge, because the specific effects of monensin on horses is outside the realm of the layperson.

For these reasons, the Court denies Plaintiffs' motion to reconsider its decision regarding the scope of Dr. Box's testimony. Because Dr. Box may not testify as an expert, and he may not testify in his capacity as a treating veterinarian about his opinion regarding diagnosis or causation, Plaintiffs will not have a causation expert to establish that monensin injured or killed their horses. (*See* Doc. 113 at 12–13.) The Court held previously—and Plaintiffs do not move to reconsider this finding—that "New Mexico requires expert testimony to show causation in cases . . . where causation cannot be determined by common knowledge that an average person ordinarily possesses." (*Id.* at 13 (quoting *Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1060–61 (D.N.M. 2016) (internal quotation marks and brackets omitted) (subsequent citations omitted)).) To prove negligence, negligence per se, strict products liability, breach of contract, and breach of implied warranties, Plaintiffs are required to establish a causation element. (*See id.* at 13–22.) Plaintiffs have no expert to testify to causation, and their claims necessarily fail. Their new arguments do not change the Court's decision.

Finally, Plaintiffs argue that the Court should reconsider its previous rulings because they inadvertently omitted pages from Dr. Hall's deposition that they relied on to create an issue of fact regarding the amount of monensin it takes to injure a horse. (See Docs. 119 at 10–11; 113 at 9 n.6.) Even if Plaintiffs had properly submitted the missing pages the first time, this dispute of fact would not change the Court's ruling that Plaintiffs have failed to present an expert on the issue of

causation. The late admission of the missing pages does not provide a reason for the Court to reconsider its rulings on summary judgment.

## B. The Court will deny Plaintiffs' motion on the basis that they have wasted judicial resources.

Alternatively, the Court will deny Plaintiffs' motion for reasons of judicial economy. "As set forth above, a motion to reconsider is improper where it merely advances new arguments that were available at the time of the original motion. There is good reason for this rule, as requiring the Court to revisit issues wastes scarce judicial resources." *Otero v. Hartford Cas. Ins. Co.*, No. 13-601 MV/CG, 2015 WL 11089509, at *3 (D.N.M. Mar. 23, 2015). Were the Court to reconsider its rulings now, two months after Plaintiffs received their new evidence and the parties' dispositive motions were fully briefed, and on the basis of new arguments they could have raised previously, the Court's previous time and effort would be wasted.

And as Defendant notes in its motion to strike (*see* Doc. 123 at 2), Plaintiffs filed their motion late. Given that trial, currently set to begin on July 29, 2019, is fast approaching, the Court set an expedited briefing schedule and ordered Mr. Berlin to submit the motion to reconsider no later than June 5, 2019. (*See* Doc. 117 at 2.) Plaintiffs disregarded the Court's order and, without explanation or leave of Court, filed their motions on June 6, 2019.[6] (*See* Docs. 119; 120.) This disregard for the Court's orders and deadlines is not new: Plaintiffs failed to produce documents identified in their initial disclosures in violation of the Court's Initial Scheduling Order (*see* Docs. 9 at 2; 19 at 1; 66 at 3); filed an untimely motion to extend the deadline to disclose their experts

---

[6] Pointing to his computer's time stamp on the Filing Notice, Mr. Berlin argues that he filed his motion only seven minutes late. (*See* Doc. 126-1 at 2.) In a footnote, he explains that he was working in his Arizona office and acknowledges that the official CM/ECF Notice of Electronic Filing shows he filed his motion at 1:06 a.m. MDT. (*See id.*) The Court expects litigants to adhere to its deadlines using the Court's time zone, regardless of where the attorney hangs his or her hat.
Mr. Berlin makes no attempt to explain why he filed his motion to supplement on June 6, 2019, at 7:37 p.m. MDT.

and expert reports (*see* Docs. 25 at 2; 55); failed to produce Dr. Box's CV in violation of Judge Vidmar's order and the Scheduling Order (*see* Docs. 25 at 2; 42 at 2; 56 at 2; 57 at 5–6); filed their motion for summary judgment after the Court-imposed deadline (*see* Doc. 70 (ordering Plaintiffs to file by 5:00 p.m. on December 3, 2018); 73 (filing motion at 6:34 p.m.)); failed to provide reasons to support their motion for summary judgment in accordance with Local Rule 56.1(b) (*see* Docs. 73 at 14–15; 113 at 18 n.8 (noting "that the manner in which Plaintiffs have presented their 'arguments' both for and against summary judgment have thwarted the Court's efforts at providing a meaningful opinion that could focus the issues at trial and . . . save the parties, and the Court, considerable time and expense") (internal quotation marks, brackets, and citation omitted) & 20); filed an untimely supplement to their motion for sanctions without seeking leave of Court (*see* Docs. 88; 89; 92); filed an untimely supplement to their response to summary judgment in violation of the Court's order and without seeking leave of Court (*see* Docs. 99; 100; 101); failed to file witness or exhibit lists in accordance with the parties' Proposed Pretrial Order (*see* Doc. 85 at 14); and failed to file a timely response to Defendant's motion in limine (*see* Doc. 115) or seek leave for an extension.

Plaintiffs have also disregarded their burden to support their own claims. They begin their motion to reconsider by asserting "that there are two types of laboratory analyses with the potential to resolve the issue of whether or not there was enough monensin in the feed to harm the horses as alleged:" (1) the testing of "*multiple* samples of the feed"; and (2) the testing of "*multiple* samples from the heart of a recently deceased horse (i.e., fresh samples) . . . ." (Doc. 119 at 3–4.) Yet, Plaintiffs failed to test multiple samples of the feed they had on hand, choosing instead to feed it to their cattle. (*See* Doc. 58-D at 171:18–22 (Q: "[W]hat did you do with the rest of the feed that was in the overhead bin?" A: "We fed it to our cows only.").)

Similarly, despite their knowledge that they needed to test multiple samples from the heart of a recently deceased horse (*see* Doc. 100 at 6 (noting that Plaintiffs' veterinarian instructed them "that there would 'have [to] be fresh deaths in order to learn any more than [what] was learned from the first two'")), they failed to either obtain testing of the horses that died naturally in 2017 or euthanize horses to perform the required testing until five months after discovery closed. Curiously, Plaintiffs also attempt to shift blame to Defendant for allegedly discarding a tote of fines[7] that Plaintiffs never formally requested (*see* Doc. 104 at 9), for failing to perform its own tests on the fines (*see* Doc. 83 at 5 (discussing Defendant's "failure to sample and test" the fines)), for failing to perform its own tests on the horses in December 2016 (*see* Doc. 67 at 7 (wondering why Defendant's employee, who investigated their complaint, "didn't take tissue samples, from the third and fourth horses to die, which were found a few days before he came to the scene[, and] why he didn't seek any testing on the surviving horses")), and for objecting when Plaintiffs sought to euthanize and test horses after the discovery deadline had passed (*see* Doc. 119 at 4–5 (noting that Defendant was "given notice that one or more of the horses would need to be euthanized . . . but dithered and then declined, instead stating an objection to the procedure(s) and the evidence that it would produce"); *see also* Doc. 127 at 7 (asserting that Defendant "*chose to put [itself] in this position*")). In short, Plaintiffs' lack of respect for Court orders and deadlines and lack of diligence in pursuing evidence to bolster their claims has wasted judicial resources.

## III. Plaintiffs have identified no valid reason to reconsider the Court's order regarding sanctions.

Plaintiffs also ask the Court to reconsider Judge Vidmar's order denying their motion for sanctions based on spoliation of evidence. (*See id.* at 19–23; Docs. 68; 104.) In their earlier motion

---

[7] "Fines are remnants of the feed pellets, and are created during the manufacturing process, as well as the delivery process as the pellets move and fines break off from the pellets." (Doc. 104 at 3 n.2 (quoting Doc. 90 at 4).)

for sanctions, Plaintiffs argued that Defendant failed to retain fines from the December 2016 production process of Plaintiffs' feed, despite Defendant's knowledge that the fines were relevant to a potential legal claim. (*See* Docs. 119 at 19; 68.) Judge Vidmar denied the motion for two reasons. First, Judge Vidmar stated that he would not award spoliation sanctions for the alleged destruction of evidence that Plaintiffs never requested in formal, written discovery. (*See id.* at 9.) Second, he denied the motion because Plaintiffs did not establish "that Defendant failed to preserve evidence after it knew that litigation was imminent." (*Id.* at 10.)

Again, Plaintiffs move for reconsideration pursuant to Rules 59 and 60, neither of which provide the correct legal standard. Examining Plaintiffs' motion pursuant to Rules 72 and 54(b), the Court will deny it.

### A.    The Court will deny an appeal pursuant to Rule 72 as untimely.

Plaintiffs failed to file objections to Judge Vidmar's order denying their Motion. *See* Fed. R. Civ. P. 72(a). It does not appear that Plaintiffs are presently objecting to Judge Vidmar's order under Rule 72, but even if the Court construed the Motion as a Rule 72 objection to a magistrate judge's nondispositive order, the Court would overrule the objections because Judge Vidmar committed no clear error and Plaintiffs failed to timely file their objections within 14 days of the order. See Fed. R. Civ. P. 72(a).

### B.    The Court will deny Plaintiffs' motion to reconsider pursuant to the Rule 59(e) standard of review.

Although Plaintiffs never cite the applicable standard, it appears that Plaintiffs base their motion on a "need to correct clear error or prevent manifest injustice." (*See* Doc. 119.) *See also Ankeney*, 524 F. App'x at 458 (quotation omitted). Plaintiffs argue that Judge Vidmar erred in finding that there was no evidence that Defendant destroyed the fines after it knew litigation was imminent. (Doc. 119 at 21.) Plaintiffs assert that "[t]here is ample evidence" that the fines were

still on Defendant's property when Mr. Derrick called Defendant on December 21, 2016, to inform Defendant that Plaintiffs "wished to be compensated for their dead and damaged horses" due to monensin-tainted feed. (*See id.*) Plaintiffs cite to deposition testimony from two of Defendant's employees, who testified that the fines "should have been in the tote bay" at the time of the December phone call, because they were typically held for four to six months. (*Id.* at 22 (citation omitted).) One of the employees later changed his testimony and indicated that the feed could have been taken out of storage days or weeks later, rather than months. (*Id.* at 23 (citation omitted).) Considering this same evidence, Judge Vidmar found that Plaintiffs failed to meet their burden, as it was "unclear whether . . . Defendant had already destroyed the fines" at the time of the December 21, 2016 phone call. (Doc. 104 at 10–11.)

Plaintiffs have failed to demonstrate that Judge Vidmar's decision was arbitrary, capricious, manifestly unreasonable, or is fundamentally unfair. *See Thymes*, 2016 9777487, at *2. They complain that Judge Vidmar's order severely prejudiced them, as "Plaintiffs' case is to be dismissed for lack of adequate proof of sufficient monensin in the feed to cause the harm to the horses." (Doc. 119 at 21.) And they contend that "[w]ithout the missing feed/fines to test, the Court dismissed most of Plaintiffs' claims for lack of adequate evidence of how much monensin was in the feed." (*Id.*) As the Court explained above, Plaintiffs have made numerous decisions that have impeded their ability to prove their claims, including their decision to *not* request the fines through formal discovery.

More importantly, the Court denies Plaintiffs' motion because they only argue that Judge Vidmar erred in finding that Plaintiffs failed to prove that Defendant destroyed the fines after the December 2016 phone call. They do not contest the primary reason that Judge Vidmar denied their motion for sanctions: that he would not award spoliation sanctions for the alleged destruction of

evidence that Plaintiffs never requested in formal, written discovery. (*See* Doc. 104 at 9.)[8] Because this reason operated as a separate and independent ground to deny the motion for sanctions, Plaintiffs' failure to contest it here dooms the instant motion. To borrow a phrase from Plaintiffs, "Respectfully, [Mr. Berlin] missed the point." (Doc. 119 at 21.)[9]

In short, Plaintiffs have provided no reason for the Court to reconsider any of the rulings in the April 12, 2019 Memorandum Opinion and Order denying Plaintiffs' motion for sanctions, or in its May 8, 2019 Memorandum Opinion and Order on the parties' motions for summary judgment.

## IV. The Court will grant Defendant's motion in limine as unopposed.

Local Rule 7.1(b) provides that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b). Defendant filed its motion in limine on May 28, 2019. (Doc. 115.) Approximately one month has passed, and Plaintiffs have not filed a response or a motion seeking an extension of time to file a response. On June 19, 2019, Defendant filed a Notice of Completion of Briefing and stated that "Plaintiffs did not file a response to [the motion in limine] within the 14[-]day period required by D.N.M. LR-Civ. 7.4(a) and" thus the motion is ripe for decision. (*See id.*)

The Court finds that, pursuant to the Local Rules, Plaintiffs' failure to respond constitutes consent to grant the motion. Accordingly, the parties may not present any evidence, argument, or

---

[8] It is precisely for this reason that Plaintiffs have nothing more "than the hearsay avowal of counsel" that Defendant no longer has the fines. (*See* Doc. 119 at 21.)

[9] Plaintiffs also appear to take issue with Judge Vidmar's determination that Defendant's failure to produce its monensin inventory did not merit sanctions. (*See* Doc. 119 at 23.) Because Plaintiffs fail to explain how Judge Vidmar allegedly erred, the Court will deny their motion as to the monensin inventory.

reference to horse deaths, horse injuries, emotional distress, or monetary damages at trial that are irrelevant to Plaintiffs' remaining claims.

## V.     Federal Rule of Civil Procedure 54(b) certification is improper in this case.

While Plaintiffs have not filed a motion for certification under Rule 54(b), Mr. Berlin has twice mentioned Plaintiffs' desire to immediately appeal the Court's ruling on summary judgment. (*See* Docs. 117 at 2 (Mr. Berlin noting that Plaintiffs may wish to immediately appeal, pursuant to Federal Rule of Civil Procedure 54(b)); 126 at 6 n.4 (asserting that "there is no just reason to delay appealing").) Rule 54(b) gives the Court discretion to enter a final judgment on fewer than all claims in a lawsuit in limited circumstances. *See* Fed. R. Civ. P. 54(b); *see also Jordan v. Pugh*, 425 F.3d 820, 826 (10th Cir. 2005). "Rule 54(b) establishes three prerequisites for appeal of a separate final judgment on fewer than all claims in a lawsuit: (1) multiple claims; (2) a final decision on at least one claim; and (3) a determination by the district court that there is no just reason for delay." *Jordan*, 425 F.3d at 826 (citing 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Proc. § 2656, at 48–60 (3d ed. 1998)).

"The controlling jurisdictional question is thus whether" the claims the Court dismissed— negligence, negligence per se, strict products liability, breach of contract, and breach of implied warranties—are "distinct and separable from the claims left unresolved"—fraudulent misrepresentation, negligent misrepresentation, and unfair, deceptive, and unconscionable trade practices under the Unfair Practices Act (UPA). *See id.* at 826–27 (quotation omitted). "For purposes of Rule 54(b), a claim comprises 'all factually or legally connected elements of a case . . . .'" *Id.* at 827 (quoting *Okla. Turnpike Auth. v. Bruner*, 259 F.3d 1236, 1241 (10th Cir. 2001)). Courts look at whether the claims overlap or are redundant, whether they "turn on the same factual

questions, whether they involve common legal issues, and whether separate recovery is possible." *See id.* (citations omitted).

Here, all of Plaintiffs' claims flow from a single issue or event: whether Defendant's feed was tainted by monensin. Thus, even though Plaintiffs have asserted different theories of liability, "the concept of a 'claim' under Rule 54(b) denotes the aggregate of operative facts which give rise to a right enforceable in the courts." *Gen. Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1028 (6th Cir. 1994) (internal quotation marks and citations omitted); *see also* Wright, Miller & Kane § 2657 (noting that "when plaintiff is suing to vindicate one legal right and alleges several elements of damage or seeks multiple remedies, only one claim is presented and subdivision (b) does not apply").

This conclusion is reinforced by examining the possible damages of Plaintiffs' remaining claims. First, because they are not able to prove causation, Plaintiffs "cannot pursue a claim for negligent misrepresentation[,]" because "nominal and punitive damages are not available in a negligence action absent proof of actual damages." *See Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 620 (N.M. 2013) (citation omitted). Second, under the UPA, Plaintiffs are permitted "to recover actual damages or the sum of one hundred dollars ($100), whichever is greater." *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1099 (N.M. Ct. App. 2007) (quoting N.M. Stat. Ann. § 57-12-10(B)). As Plaintiffs cannot prove actual damages without a causation expert, the most they may recover is $100. *See id.* In short, Plaintiffs' recovery for two of their three remaining claims is tied to causation and this Court's opinion on summary judgment. Plaintiffs' claims are not separable for purposes of Rule 54(b).

Moreover, Plaintiffs have not provided any argument to show there is no just reason for delay, nor can the Court find such reason where the determination of damages relies so heavily on

causation. *See Jordan*, 425 F.3d at 826. Accordingly, the Court will deny Plaintiffs' request for Rule 54(b) certification.

Because trial is imminent, Plaintiffs are faced with a tactical decision if they wish to immediately appeal the Court's prior ruling dismissing their causation-related claims rather than proceed to trial on the remaining claims. As discussed above, the Court will not allow Plaintiffs to appeal some of their claims while others remain pending, but they are free to dismiss the remaining claims, to make an offer of settlement to Defendant on the remaining claims, or to devise some other strategy to pursue an immediate appeal.

If Plaintiffs wish to make such a decision so that they may pursue an immediate appeal, they must file an appropriate notice (i.e., a notice of voluntary dismissal) no later than **5:00 p.m. MDT on Friday, July 5, 2019**. If Plaintiffs do not file a notice, the case will move forward to trial.

**THEREFORE,**

**IT IS ORDERED** that Plaintiffs' Motion for Reconsideration (Doc. 119) is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Supplement (Doc. 120) is **GRANTED** insofar as the Court considered the exhibits in ruling on Plaintiffs' motion to reconsider;

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiffs' Motion for Reconsideration (Doc. 123) is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine (Doc. 115) is **GRANTED AS UNOPPOSED**;

**IT IS FURTHER ORDERED** that if Plaintiffs wish to file an immediate appeal of the Court's summary judgment ruling, they must file an appropriate notice as described herein; and

**IT IS FURTHER ORDERED** that the final pretrial conference currently set for Tuesday,

July 2, 2019, is hereby **VACATED** and **RESCHEDULED** for **Thursday, July 11, 2019**, at **8:45**

**a.m. MDT**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE